UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

KELLY KEEHNER,                          NO. CIV. 2:11-1954 WBS EFB

            Plaintiff,
                                        MEMORANDUM AND ORDER RE:
     v.                                 MOTION FOR SUMMARY JUDGMENT

THE JACKSON LABORATORY, a
Corporation of unknown origin;
and DOES 1 through 100,
inclusive,

            Defendant.
_____/


                        ----oo0oo----

            Plaintiff Kelly Keehner brought this action against her

former employer, defendant The Jackson Laboratory, alleging

various claims under California's Fair Employment and Housing Act

("FEHA"), Cal. Gov't Code § 12940 et seq., arising out of

defendant's allegedly unlawful termination of plaintiff based on

her physical disability.  Defendant now moves for summary

judgment on all claims pursuant to Federal Rule of Civil

Procedure 56.

1

I.    Relevant Facts

Defendant is a nonprofit biomedical research organization with a mission to discover the genetic basis for preventing, treating, and curing human diseases. (Vandegrift Decl. ¶¶ 2, 7 (Docket No. 16-14).)  Defendant breeds and uses mice as a research tool and supplies mice to laboratories and research institutions around the world. (Id. ¶¶ 8-9.)

Defendant hired plaintiff on May 10, 2010, to work at its Sacramento facility as an Animal Care Trainee I at an hourly rate of $12.25 per hour. (Lee Decl. Ex. A ("Pl.'s Dep.") at 29:18-21, 35:9-10 (Docket No. 16-3).)  Plaintiff was hired as an "at-will" employee for a ninety-day introductory period that could be extended by defendant. (Id. at 30:5-32:13, Ex. C; McClure Decl. ¶ 4, Ex. B (Docket No. 16-12).)  As an Animal Care Trainee I, plaintiff's duties consisted primarily of physical activities related to caring for the research mice. (Pl.'s Dep. at 73:20-74:19, 80:10-81:6, 99:24-100:1; Escobedo Decl. ¶ 3 (Docket No. 16-9).)

Trainees spent approximately two full days each typical work week conducting "animal welfare checks."[1]  (Pl.'s Dep. at 79:13-20.)  During animal welfare checks, a trainee visually

_____

[1]    In plaintiff's declaration supporting her opposition to this motion, she states that "[a]nimal welfare checks do not take up almost half of a trainee's job." (Keehner Decl. ¶ 18 (Docket No. 23).)  This statement directly contradicts her earlier deposition testimony. (See Pl.'s Dep. at 79:13-20.)  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991).  Plaintiff's declaration does not explain how her present declaration testimony is not inconsistent with her earlier deposition testimony.  The court will therefore disregard plaintiff's deposition statement on this matter.

2

checks each cage to determine if the mice look healthy or need food or water, and then refills the food or water if needed. (Id. at 73:5-74:19, 99:24-25, 100:1; Escobedo Decl. ¶ 3.)  The remaining three full days each week are dedicated to "cage changes" and "inventory" in which the mice are transferred from dirty to clean cages with the use of forceps. (Pl.'s Dep. at 73:5-74:19, 79:13-21, 80:10-23; Escobedo Decl. ¶ 3.)

The majority of a trainee's job duties, including animal welfare checks and cage changes, occur in "barrier rooms" where the mice are bred.  Before entering the sterile barrier room, an employee must shower and then change into scrubs, safety glasses, booties, hairnet, and a respirator. (Pl.'s Dep. at 33:21-34:23; Escobedo Decl. ¶ 4; Vandegrift Decl. ¶ 5.) Employees repeat the showering and changing procedure when moving between barrier rooms to prevent the transfer of contamination from one room to another. (Pl.'s Dep. at 33:21-34:23; Escobedo Decl. ¶ 4.)

On June 21, 2010, plaintiff reported a right arm and shoulder injury she allegedly sustained while repetitively using forceps to transfer mice between cages. (Pl.'s Dep. at 49:13-18.)  Following the injury, defendant instructed plaintiff to pause once an hour to stretch and broke up plaintiff's daily activities. (Id. at 66:24-67:25, Ex. F.)

On June 23, 2010, plaintiff's physician instructed her to work more slowly and placed her on modified work duty.  (Id. at 57:5-10, 69:21-70:12; Lee Decl. ¶ 5, Ex. C at 84.)  Defendant reduced the number of cages that plaintiff was responsible for to roughly one half of her pre-injury responsibility. (Pl.'s Dep.

at 58:4-7, 68:3-18.)  Plaintiff's hourly wage remained the same during this period.  (Id. at 88:4-11.)  Plaintiff confirms that no one asked her to work faster, (id. at 58:13-14), but states that she felt pressured to do so because there was a lot of work to be done and her supervisor asked her if she felt that she could do more, (id. at 58:7-16).

When plaintiff had difficulty accomplishing her duties, she would ask her supervisors if she could do something else for a while to give her arm a break.  (Id. at 59:17-21.)  Plaintiff's requests were accommodated by her supervisors and she was provided alternate tasks.  (Id. at 59:19-61:9.)  Plaintiff did not make any other accommodation requests at this time.  (Id. at 68:19-23.)

On July 27, 2010, plaintiff's physician further restricted plaintiff's ability to work by limiting the use of her right arm and shoulder and prohibiting any reaching above her right shoulder.  (Id. at 98:25-99:7; Lee Decl. ¶ 5, Ex. C at 82.) As of July 30, 2010, defendant had plaintiff stop doing cage changes, a core job function, and limited her to animal welfare checks for the middle and bottom rows of cages.  (Pl.'s Dep. at 99:13-20, 109:18-110:9, Ex. N.)  In lieu of cage changes, plaintiff was assigned administrative work.  (Id. at 110:11-19, 111:13-19; Escobedo Decl. ¶ 6; Ramos Decl. ¶ 5 (Docket No. 16-13).)

On August 6, 2010, defendant extended plaintiff's introductory period for an additional ninety days to allow her more time to learn the Trainee position.  (Pl.'s Dep. at 117:21-118:20, 120:10-13, Ex. O.)

4

1    On August 18, 2010, defendant issued plaintiff a new
2 schedule.  Due to her injury, plaintiff requested additional time
3 to change clothes when leaving the barrier room, more time in the
4 barrier room, and less time in the administrative area.  (Id. at
5 138:23-139:20, Ex. R.)  Plaintiff also told defendant which
6 specific tasks she felt she could perform in the barrier room.
7 (Id. at 140:4-143:21, Ex. R.)  Based on plaintiff's suggestions,
8 defendant updated plaintiff's schedule and she had no further
9 issues with the modified schedule.  (Id. at 143:22-144:4, Ex. R.)

10    On August 23, 2010, plaintiff's physician ordered
11 plaintiff to cease all work with her right arm.  (Id. at 146:1-9;
12 Lee Decl. ¶ 4, Ex. B at 81.)  Defendant was unable to find tasks
13 for plaintiff to perform with this restriction but allowed
14 plaintiff to take temporary medical leave beginning on August 24,
15 2010.  (Pl.'s Dep. at 147:24-148:13, Ex. S; Escobedo Decl. ¶ 7;
16 Ramos Decl. ¶ 7.)

17    On September 27, 2010, plaintiff's physician modified
18 plaintiff's restrictions to no lifting over ten pounds, no
19 overhead work, and no repetitive use of her right arm (defined as
20 "no more than ten minutes per half hour").  (Pl.'s Dep. at
21 152:15-153:9, 161:23-162:6, Exs. T, U; Lee Decl. ¶ 4, Ex. B at
22 61, 64.)  Defendant would have permitted plaintiff to remain on
23 disability leave longer to facilitate recovery, but plaintiff
24 returned to work on October 1, 2010, because of personal
25 financial reasons.  (Pl.'s Dep. at 150:12-13, 151:18-152:8; Lux
26 Decl. ¶ 4 (Docket No. 16-11).)  Defendant provided plaintiff with
27 a modified schedule and sought to incorporate plaintiff's medical
28 appointments into the schedule.  (Ramos Decl. ¶ 10.)

1    Under plaintiff's modified schedule, she was no longer
2    required to provide mice with food and water during animal
3    welfare checks and instead only had to check the cages to see if
4    food and water was needed. (Pl.'s Dep. at 156:3-8; Escobedo
5    Decl. ¶ 9.)  When plaintiff reported difficulty marking the cages
6    to report whether food or water was needed, defendant came up
7    with ways for plaintiff to report the cages without having to
8    write. (Pl.'s Dep. at 156:9-157:2, 163:22-164:22; Escobedo Decl.
9    ¶ 9.)  When plaintiff reported difficulty with filing documents
10   in the administrative area, defendant requested that her
11   physician provide a written restriction to that effect. (Pl.'s
12   Dep. at 173:4-13, 174:10-23.)  Plaintiff's modified duties also
13   included photocopying, data entry, archiving, and stickering and
14   strapping boxes, which plaintiff could do at that time. (Id. at
15   171:1-13, 172:22-173:1-22.)

16   On October 5, 2010, plaintiff's hourly rate was raised
17   to $12.40 an hour even though she had not fulfilled the
18   requirements of the Trainee position. (Id. at 185:6-17; McClure
19   Decl. ¶ 6, Ex. D.)

20   On October 11, 2010, plaintiff was once against
21   restricted by her physician from any use of her right arm.
22   (Pl.'s Dep. at 192:2-5; Lee Decl. ¶ 4, Ex. B at 49.)  Defendant
23   had plaintiff stop working in the barrier room entirely because
24   dressing and undressing was painful for plaintiff and instead
25   scheduled her to read Standard Operating Procedures and review in
26   vivo project folders. (Pl.'s Dep. at 185:19-25, 186:1-9, 188:8-
27   189:1, 197:6-19, 198:25-199:11, Ex. W; Escobedo Decl. ¶ 10.)

28   On November 17, 2010, plaintiff underwent arthroscopic

6

surgery on her right shoulder.  (Pl.'s Dep. at 199:12-13.)
Defendant allowed plaintiff to take medical leave for her surgery
and recuperation and informed plaintiff that it was working to
create a schedule to accommodate her restrictions.  (Id. at
199:12-18, 201:11-18, 228:23-230:15, Ex. CC; Dominguez Decl. ¶ 3
(Docket No. 16-8).)

On January 5, 2011, plaintiff's physician changed her
work restriction to no lifting over ten pounds, no pushing, no
pulling, no overhead work, no repetitive use of her right arm,
and to ice as needed.  (Pl.'s Dep. at 223:9-24, Ex. BB; Lee Decl.
¶ 4, Ex. B at 37.)  Defendant accommodated plaintiff's request
that she be allowed to do exercises four times a day and ice her
arm for twenty minutes after each exercise session.  (Pl.'s Dep.
at 260:23-262:10, Ex. EE; Lux Decl. ¶ 7, Ex. B.)

When plaintiff returned to work on January 13, 2011,
defendant presented her with a Notice of Offer of Modified or
Alternative Work ("Modified Work Offer") listing a description of
duties, activities, and physical requirements of plaintiff's
light-duty position.  (Pl.'s Dep. at 231:1-8, Ex. DD; Dominguez
Decl. ¶ 4, Ex. A.)  Plaintiff's light duties were to read and
understand study files, perform animal welfare checks, perform
other Trainee duties in the barrier room, archive custom breeding
folders, distribute mail, and catalogue tissue samples.  (Pl.'s
Dep. at 234:3-241:8, Ex. DD.)  The physical requirements to
complete plaintiff's modified work duties included dressing and
undressing, walking, standing, sitting, typing, filing, writing,
reading, lifting less than ten pounds, bending, stacking at
normal height, opening doors, applying stickers, non-repetitive

hand gripping, hand-held computer use, sweeping and mopping, wiping surfaces below the shoulder, and observing.  (Id. at 248:10-250:23, Ex. DD.)  Plaintiff understood that she was not taking over someone else's job when she performed the modified light duties and that she would eventually return to her Animal Care Trainee I position after she recuperated.  (Id. at 307:4-16, 414:17-25, 415:1-3; Dominguez Decl. ¶ 4; Lux Decl. ¶ 6.)

Plaintiff believed that some of the light duties fell outside of her work restriction, however her physician had not told her specifically what duties were outside her restrictions.  (Pl.'s Dep. at 254:6-255:25, 317:4-320:2, 382:11-14, Ex. E.) Defendant told plaintiff that she would be expected to complete the duties on the Modified Work Offer unless her physician specifically stated what activities she was unable to do.  (Id. at 258:1-5, 270:1-6, 284:16-18.)  Plaintiff called her physician's office to report that her restrictions needed to be more clearly defined because otherwise she would be expected to sweep, mop, and repetitively use her right arm.  (Id. at 258:8-15.)  Plaintiff faxed her physician a copy of the Modified Work Offer and her physician noted that she was no longer to sweep or mop and that she should not repetitively use her right arm.  (Id. at 250:25-251:9, 258:18-22, Ex. DD; Lee Decl. ¶ 4, Ex. B at 26.) Defendant removed sweeping and mopping from plaintiff's duties.  (Pl.'s Dep. at 460:20-22; Escobedo Decl. ¶ 12.)  Plaintiff did not ask her physician to specify any other duties that she was unable to perform.  (Pl.'s Dep. at 468:17-469:5.)

On January 20, 2011, plaintiff reported to defendant that dressing, filing, typing (if not done with her left hand),

8

stacking, and applying stickers were all repetitive tasks.  (Id. at 276:23-277:21, Ex. GG.)  Plaintiff also reported that she could not date or initial pages in the animal orders because it was a repetitive motion and she was unable to write with her left hand.  (Id. at 249:9-14, 281:10-282:8, Ex. HH.)  Defendant informed plaintiff that she could write as large as necessary with her left hand and plaintiff ultimately switched between her left and right hand in order to complete animal orders.  (Id. at 281:24-282:19, Ex. HH.)  Plaintiff's assigned task to review Reading and Understanding ("R/U") project folders also required signing and dating each page and posed the same problem as the animal orders.  (Id. at 188:16-189:6, 220:11-22, 263:25-264:4.)

On January 21, 2011, defendant met with plaintiff to determine what activities she felt she could do.  (Id. at 275:6-14, 288:12-23, Ex. JJ; Escobedo Decl. ¶ 14, Ex. C.)  Plaintiff said that she could only do computer work with her left hand, animal orders, and tissue block organization.  (Pl.'s Dep. at 289:4-8, Ex. JJ; Escobedo Decl. ¶ 14, Ex. C.)  Plaintiff could not identify any other tasks that she could complete and felt that it was defendant's responsibility to create a schedule of tasks that she could perform.  (Pl.'s Dep. at 168:11-22, 289:4-25, Ex. JJ; Escobedo Decl. ¶ 14, Ex. C.)

Plaintiff later informed defendant that she could only do tissue block organization for a brief period of time because it required the use of her right arm.  (Pl.'s Dep. at 243:15-245:8, 338:22-339:9, 340:17-19, Ex. OO.)  Plaintiff raised a similar complaint regarding filing.  (Id. at 249:6-8, 338:22-339:9, Exs. GG, PP.)  Regarding custom breed archiving, plaintiff

9

1  stated that she could do the data entry portion of the task, but

2  that putting the files back, taking the pages out of the files,

3  and paper clipping/binding the stacks required repetitive use of

4  her right arm.  (<u>Id.</u> at 338:22-339:16, Ex. PP.)[2]

5          On February 1, 2011, defendant wrote to plaintiff's

6  physician requesting clarification of plaintiff's restriction

7  that she not repetitively use her right arm.  (Lux Decl. ¶ 8, Ex.

8  C.)  Plaintiff's physician wrote back on February 4, 2011, and

9  defined "repetitive use" to mean "anything that is done in a

10 repeated manner for more than 5 minutes."  (Pl.'s Dep. at 351:7-

11 24, Ex. TT; Lee Decl. ¶ 4, Ex. B at 38.)  Defendant informed

12 plaintiff that it did not need to change her assigned work

13 because it only required plaintiff to use her right arm

14 intermittently.  (Pl.'s Dep. at 355:9-356:2, Ex. UU; Lux Decl.

15 ¶ 9.)  Plaintiff acknowledged that she was only using her arm

16 intermittently and did not request that defendant further modify

17 her work schedule.  (Pl.'s Dep. at 355:3-356-2, Ex. UU; Lux Decl.

18 ¶ 9.)

19         On February 17, 2011, plaintiff's physician determined

20 that plaintiff's injury and work restrictions were permanent.

21 (Pl.'s Dep. at 17:5-7, 361:16-362:7, 366:10-18, 419:5-11; Lee

22 Decl. ¶ 4, Ex. B at 21.)  On March 3, 2011, supervisors and a

23 human resources representative met with plaintiff to discuss

24 plaintiff's permanent disability.  (Pl.'s Dep. at 383:10-11, Ex.

25

26         [2]    Plaintiff later stated that she did not recall having
   difficulty completing her custom breeding archiving duties so
27 long as she was not required to carry the boxes.  (Pl.'s Dep. at
   339:17-340:10.)   She did, however, acknowledge that she wrote to
28 defendant regarding this complaint.  (<u>Id.</u> at 340:11-12.)

1   BBB; Dominguez Decl. ¶ 6, Ex. B; McClure Decl. ¶ 12.)  At this

2   meeting, plaintiff acknowledged that she was unable to perform

3   the essential functions of the Animal Care Trainee I position,

4   with or without accommodation.  (Pl.'s Dep. at 380:11-13, 385:21-

5   23, 386:11-15, Ex. BBB; Dominguez Decl. ¶ 6, Ex. B; Lux Decl.

6   ¶ 12, Escobedo Decl. ¶ 17.)  Defendant determined that it was not

7   able to permanently accommodate plaintiff's disability because

8   she could not perform the functions of her job with or without

9   restrictions and that it was not going to create a new position

10  for her.  (Pl.'s Dep. at 381:22-25, 387:9-15, 396:24-397:1,

11  406:17-22, Exs. BBB, CCC, DDD; Escobedo Decl. ¶¶ 17-19; McClure

12  Decl. ¶¶ 10-11.)  Since then, defendant has not created a new,

13  permanent position for anyone else that encompasses the duties

14  that plaintiff performed in her Modified Work Offer.  (Lux Decl.

15  ¶ 13.)

16          Defendant presented plaintiff with all the currently

17  open positions in its Sacramento and Bar Harbor, Maine

18  facilities.  (Pl.'s Dep. at 385:6-20, Exs. BBB, CCC, DDD; McClure

19  Decl. ¶ 12.)  Plaintiff informed defendant that she was not

20  qualified for any of the open positions and did not want to move

21  to Bar Harbor, Maine.  (Pl.'s Dep. at 381:12-17, 386:8-387:8,

22  390:6-11, 391:10-21, 395:10-17, 397:18-398:16, Ex. DDD.)

23  Plaintiff told defendant that she did want to continue to do the

24  custom breed archiving that she had been doing under her light-

25  duty assignment and that she believed the work would last at

26  least a couple more months.  (Id. at 381:19-25, 396:3-23, Ex.

27  DDD.)  Plaintiff also said that she wanted to get a second

28  opinion as to whether her restrictions were permanent, but did

1  not seek a second opinion until August 18, 2011, after this suit

2  was filed.  (Id. at 387:23-388:12, 397:2-14, 422:3-24, Ex. BBB.)

3          Plaintiff's employment with defendant ended on March 4,

4  2011.  (McClure Decl. ¶ 14.)  Defendant told plaintiff that her

5  employment was ending because it could not create a new position

6  for her, but plaintiff believed that her employment ended because

7  she did not agree to work outside her restrictions.  (Pl.'s Dep.

8  at 405:18-406:22.)  Plaintiff expected that defendant would hold

9  the light-duty position open for her for at least one year.  (Id.

10 at 407:3-11.)  During plaintiff's exit interview, she did not

11 report any discrimination, harassment, or retaliation.  (Id. at

12 403:20-25; McClure Decl. ¶ 15.)

13         On May 10, 2011, plaintiff filed suit against defendant

14 in state court alleging seven causes of action: (1) disability

15 discrimination (FEHA); (2) failure to reasonably accommodate

16 (FEHA); (3) failure to engage in interactive process (FEHA); (4)

17 retaliation (FEHA); (5) failure to prevent discrimination (FEHA);

18 (6) retaliation in violation of public policy; and (7) wrongful

19 termination in violation of public policy.[3]  (Docket No. 2-1.)

20 Defendant removed the case to federal court based on diversity

21 jurisdiction.  (Docket No. 2.)

22 II.  Discussion

23         Summary judgment is proper "if the movant shows that

24 there is no genuine dispute as to any material fact and the

25 movant is entitled to judgment as a matter of law." Fed. R. Civ.

26 _____

27     [3]   Plaintiff does not oppose defendant's motion for
   summary judgment as to claims four, five, and six.  Accordingly,
28 the court will grant defendant's motion for summary judgment as
   to those claims.

P. 56(a).[4]  A material fact is one that could affect the outcome
of the suit, and a genuine issue is one that could permit a
reasonable jury to enter a verdict in the non-moving party's
favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).  The party moving for summary judgment bears the initial
burden of establishing the absence of a genuine issue of material
fact and can satisfy this burden by presenting evidence that
negates an essential element of the non-moving party's case.
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
Alternatively, the moving party can demonstrate that the
non-moving party cannot produce evidence to support an essential
element upon which it will bear the burden of proof at trial.
Id.

Once the moving party meets its initial burden, the
burden shifts to the non-moving party to "designate 'specific
facts showing that there is a genuine issue for trial.'"  Id. at
324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,
the non-moving party must "do more than simply show that there is
some metaphysical doubt as to the material facts."  Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
"The mere existence of a scintilla of evidence . . . will be
insufficient; there must be evidence on which the jury could
reasonably find for the [non-moving party]."  Anderson, 477 U.S.
at 252.

In deciding a summary judgment motion, the court must

---

[4]    Federal Rule of Civil Procedure 56 was revised and
rearranged effective December 1, 2010.  However, as stated in the
Advisory Committee Notes to the 2010 Amendments to Rule 56,
"[t]he standard for granting summary judgment remains unchanged."

1  view the evidence in the light most favorable to the non-moving

2  party and draw all justifiable inferences in its favor.  Id. at

3  255.  "Credibility determinations, the weighing of the evidence,

4  and the drawing of legitimate inferences from the facts are jury

5  functions, not those of a judge . . . ruling on a motion for

6  summary judgment . . . ."  Id.

7           Plaintiff's claims for FEHA disability discrimination

8  are subject to the McDonnell Douglas burden-shifting analysis

9  used at summary judgment to determine whether there are triable

10  issues of fact for resolution by a jury.  Guz v. Bechtel Nat'l

11  Inc., 24 Cal. 4th 317, 354 (2000); see McDonnell Douglas Corp. v.

12  Green, 411 U.S. 792 (1973).  Under McDonnell Douglas,

13           a plaintiff must first establish a prima facie case of
             discrimination [or other illegal conduct].  The burden
14           then shifts to the employer to articulate a legitimate,
             nondiscriminatory reason for its employment action.  If
15           the employer meets this burden, the presumption of
             intentional discrimination [or other illegal conduct]
16           disappears, but the plaintiff can still prove disparate
             treatment  by,  for  instance,  offering  evidence
17           demonstrating  that  the  employer's  explanation  is
             pretextual.

18

19  Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3 (2003) (internal

20  citation omitted).  If plaintiff fails to carry her initial

21  burden to establish a prima facie case of discrimination, summary

22  judgment is appropriate.  If plaintiff successfully establishes

23  her prima facie case, the "burden of production, but not

24  persuasion, [] shifts to the employer to articulate some

25  legitimate, nondiscriminatory reason for the challenged action."

26  Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1123-24 (9th Cir.

27  2000) (citing McDonnell Douglas, 411 U.S. at 802).

28           Assuming the employer articulates a legitimate,

14

nondiscriminatory reason for its actions, plaintiff, in order to survive summary judgment, bears the burden of supplying evidence to the court that gives rise to an inference of intentional discrimination.  See Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1094 (9th Cir. 2005) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993)).  At this stage of the analysis, "[t]he mere existence of a prima facie case, based on the minimum evidence necessary to raise a McDonnell Douglas presumption, does not preclude summary judgment" in favor the employer.  See Wallis v. J.R. Simplot Co., 26 F.3d 885, 890 (9th Cir. 1994).  Rather, "[i]n response to the defendant's offer of nondiscriminatory reasons, the plaintiff must produce specific, substantial evidence of pretext."  Id.  "In other words, the plaintiff must tender a genuine issue of material fact as to pretext in order to avoid summary judgment."  Id.

> A.   Disability Discrimination and Failure to Reasonably
>      Accommodate

FEHA makes it an "unlawful employment practice . . . [f]or an employer, because of the . . . physical disability [or] mental disability . . . of any person, . . . to bar or to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."  Cal. Gov't Code § 12940(a).  To establish a prima facie case of disability discrimination, a plaintiff must show that: (1) she suffered from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, meaning that she was a "qualified individual"; and (3) was subjected to an adverse employment

15

1   action because of the disability.  Brundage v. Hahn, 57 Cal. App.

2   4th 228, 236 (2d Dist. 1997); see also Green v. California, 42

3   Cal. 4th 254, 262 (2007) (a plaintiff bears the burden as part of

4   a prima facie case to show he could perform "essential job

5   duties" with or without accommodation).

6         Similarly, FEHA proscribes an employer from "fail[ing]

7   to make reasonable accommodation for the known physical or mental

8   disability of an . . . employee."  Cal. Gov't Code § 12940(m).

9   "The elements of a failure to accommodate claim are (1) the

10  plaintiff has a disability under FEHA, (2) the plaintiff is

11  qualified to perform the essential functions of the position, and

12  (3) the employer failed to reasonably accommodate the plaintiff's

13  disability."  Scotch v. Art Inst. of Cal.-Orange Cnty., Inc., 173

14  Cal. App. 4th 986, 1009-10 (4th Dist. 2009).  A reasonable

15  accommodation is "a modification or adjustment to the workplace

16  that enables the employee to perform the essential functions of

17  the job held or desired."  Nadaf-Rahrov v. Neiman Marcus Grp.,

18  Inc., 166 Cal. App. 4th 952, 974 (1st Dist. 2008).

19        It is undisputed that plaintiff suffered from a

20  physical disability and was subjected to an adverse employment

21  action because of her disability, thus satisfying the first and

22  third elements of a prima facie case of disability discrimination

23  and the first element of a claim for failure to reasonably

24  accommodate.  It is also undisputed that plaintiff was not

25  capable of completing the essential functions of the Animal Care

26  Trainee I position for which she was originally hired.  (Pl.'s

27  Dep. at 380:11-13, 385:21-23, 386:11-15.)  Plaintiff instead

28  claims that she was able to fulfill the essential functions of

16

her position under the Modified Work Offer, which is the position that she sought to retain after her injury became permanent.[5]   In order to prevail on both her claim for disability discrimination and her claim for failure to provide reasonable accommodation, plaintiff must therefore show that: (1) the light-duty position was a reasonable accommodation after her injury became permanent; and (2) she was able to perform the essential duties of the light-duty position with or without reasonable accommodation.

### 1.   Light-Duty Position as a Reasonable Accommodation

A "reasonable accommodation" under FEHA entails "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." Nadaf-Rahrov, 166 Cal. App. 4th at 974.   "If the employee cannot be accommodated in his or her existing position and the requested accommodation is reassignment, an employer must make affirmative efforts to determine whether a position is available." Spitzer v. The Good Guys, Inc., 80 Cal. App. 4th 1376, 1389 (1st Dist. 2000).   Reassignment is not required, however, if "there is no vacant position for which the employee is qualified." Id.   An employer is not required to create a new job, move another employee, promote the disabled employee, or violate another employee's rights. Id.   "Although the question of reasonable accommodation is ordinarily a question of fact, when the undisputed evidence leads to only one conclusion as to the reasonableness of the accommodation sought, summary judgment

---

[5]   It is undisputed that defendant had no other open positions for which plaintiff was qualified or willing to transfer into.  (Pl.'s Dep. at 381:12-17, 386:8-387:8, 390:6-11, 391:10-21, 395:10-17, 397:18-398:16, Ex. DDD.)

1   is proper." <u>Raine v. City of Burbank</u>, 135 Cal. App. 4th 1215,

2   1227 n.11 (2d Dist. 2006) (internal citation omitted).

3          The first California decision to squarely address

4   "whether an employer is obligated under FEHA to make a temporary

5   position available indefinitely once the employee's temporary

6   disability becomes permanent" was <u>Raine v. City of Burbank</u>. <u>Id.</u>

7   at 1224.  In <u>Raine</u>, the plaintiff was a Burbank police officer

8   who was placed on front-desk assignment while he was recovering

9   from injuries.  There was no question that he could perform the

10  front desk duties.  Normally, the front-desk position was staffed

11  with civilians, although the position was "also reserved as a

12  temporary light-duty assignment for police officers recovering

13  from injuries." <u>Id.</u> at 1219.  Relying on the similarities

14  between FEHA and the American with Disabilities Act ("ADA"), the

15  court held that the defendant had no duty under FEHA to make the

16  plaintiff's temporary front-desk assignment permanent after his

17  temporary disability became a permanent one. <u>Id.</u> at 1228.

18         The holding in <u>Raine</u> has been similarly applied in

19  other FEHA cases in which a disabled plaintiff argued that they

20  were entitled to a permanent light-duty position. <u>See, e.g.</u>,

21  <u>Thomas v. Fed. Exp. Corp.</u>, 432 Fed. App'x 698, 699-700 (9th Cir.

22  2011) (interpreting FEHA); <u>Watkins v. Ameripride Servs.</u>, 375 F.3d

23  821, 828 (9th Cir. 2004) (same); <u>Galvez v. Cardinal Health, Inc.</u>,

24  No. 2:07-CV-1562-JAM, 2008 WL 5387399, at *3 (E.D. Cal. Dec. 19,

25  2008); <u>Lopez v. Unisource Worldwide, Inc.</u>, No. C 06-6290, 2007 WL

26  4259587, at *6 (N.D. Cal. Dec. 4, 2007); <u>Stoll v. The Hartford</u>,

27  No. 05CV1907, 2006 WL 3955826, at *8 (S.D. Cal. Nov. 7, 2006).

28  These cases are consistent with the proposition that

"[r]easonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected." Hanson v. Lucky Stores, Inc., 74 Cal. App. 4th 215, 226-27 (2d Dist. 1999) (quoting Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998)); see also Cuiellette v. City of L.A., 194 Cal. App. 4th 757, 767-78 (2d Dist. 2011) ("An employer is not obligated, however, to make a temporary position available indefinitely once the employee's temporary disability becomes permanent.").

Plaintiff argues that Raine is inapplicable in this case because her light-duty assignment was a permanent position that she was entitled to retain after her disability status became permanent. Plaintiff specifically points to the terms of the Modified Work Offer, in which defendant checked off boxes indicating that the position was a "permanent position" and that it would "last at least 12 months." (Dominguez Decl. ¶ 4, Ex. A.) Plaintiff's position is problematic for three reasons.

First, plaintiff stated in her deposition testimony that she chose not to sign the Modified Work Offer in question because she felt that a number of the job duties, including sweeping, mopping, filing, dressing and undressing, R/U study files, and tissue samples were repetitive duties that fell outside her restrictions. (Pl.'s Dep. at 254:6-255:22.) As discussed in greater detail below, plaintiff was not able to complete the essential functions of the Modified Work Offer, and instead was requesting that she be allowed to continue her work doing custom breed archiving. Plaintiff was therefore not requesting that she be allowed to continue under the provisions

of the Modified Work Offer, but rather requesting a separate

light-duty accommodation.  "California law is emphatic that an

employer has no affirmative duty to create a new position to

accommodate a disabled employee."  Raine, 135 Cal. App. 4th at

1224.

Second, even if plaintiff was qualified to perform the

duties under the Modified Work Offer, plaintiff understood that

she was not taking over someone else's job when she performed the

modified light duties and that she would eventually return to her

Animal Care Trainee I position after she recuperated.  (Pl.'s

Dep. at 307:4-16, 414:17-25, 415:1-3; Dominguez Decl. ¶ 4; Lux

Decl. ¶ 6.)  The fact that plaintiff would continue to be

classified as a permanent employee and that the position would be

available for at least one year does not transform a temporary

light-duty position, which is designed to accommodate an employee

while they recover from an injury, into a permanent light-duty

position, in which no recovery or return to the original position

is expected.  See Jones v. Univ. of D.C., 505 F. Supp. 2d 78

(D.D.C. 2007) (finding employer had no duty under the ADA to

provide a permanent light-duty position after plaintiff's injury

became permanent even though plaintiff had been performing light-

duty work for three years); Champ v. Baltimore Cnty., 884 F.

Supp. 991 (D. Md. 1995) (holding that employee's light-duty

position that they had held for sixteen years had not become a

permanent position).  The fact that defendant formalized

plaintiff's light-duty position does not transform it into a

permanent position.

Defendant's accommodation of plaintiff's injury was

20

1   therefore consistent with the idea that "light duty positions

2   were not intended to be a permanent post, but a temporary way

3   station or bridge between an inability to work due to injury and

4   a return to full employment status; they are intended as a shield

5   to protect the temporarily disabled, and not as a sword by which

6   a person who is otherwise unqualified for the position can demand

7   a permanent posting." Raspa v. Sheriff of the Cnty. of

8   Gloucester, 924 A.2d. 435, 445 (N.J. 2007) (applying New Jersey

9   anti-discrimination law, which is similar in form to both the ADA

10  and FEHA).

11          Third, plaintiff's reliance on Cuiellette for the

12  proposition that "the relevant inquiry is whether plaintiff was

13  able to perform the essential duties of the light duty assignment

14  he was given on his return to work and not whether he was able to

15  perform all the essential duties of [the original position]" is

16  misplaced. Cuiellette, 194 Cal. App. 4th at 769. The Cuiellette

17  court distinguished Raine on the grounds that the defendant

18  employer had a policy under which it regularly accommodated its

19  permanently disabled officers. Id. There is no evidence

20  suggesting that defendant ever created permanent light-duty

21  positions for an employee as an accommodation, nor has defendant

22  created such a position since plaintiff's termination. (Escobedo

23  Decl. ¶ 19; Lux Decl. ¶ 13.) The exception relied upon in

24  Cuiellette is therefore inapplicable in this case.

25          Defendant was under no legal obligation to accommodate

26  plaintiff by transforming a temporary light-duty position into a

27  permanent position after her injuries became permanent.

28  Plaintiff has suggested no other accommodations that defendant

1  failed to make.  Accordingly, plaintiff has not met her prima

2  facie burden to demonstrate that defendant failed to reasonably

3  accommodate her disability.

4         2.   <u>Performance of Essential Duties of Light-Duty</u>

5              <u>Position</u>

6         California's proscription against disability

7  discrimination applies only to "those employees with a disability

8  who can perform the essential duties of the employment position

9  with reasonable accommodation." <u>Green</u>, 42 Cal. 4th at 264;

10 <u>see</u> Cal. Gov't Code § 12940(a)(1).  "Therefore, in order to

11 establish that a defendant employer has discriminated on the

12 basis of disability in violation of the FEHA, the plaintiff

13 employee bears the burden of proving he or she was able to do the

14 job, with or without reasonable accommodation." <u>Green</u>, 42 Cal.

15 4th at 262.

16        Essential functions are defined as "the fundamental job

17 duties of the employment position the individual with a

18 disability holds or desires."  Cal. Gov't Code § 12926(f).

19 Evidence of essential functions may include: "([1]) [t]he

20 employer's judgment as to which functions are essential; ([2])

21 [w]ritten job descriptions prepared before advertising or

22 interviewing applicants for the job; or ([3]) [t]he amount of

23 time spent on the job performing the function."  <u>Id.</u>

24 § 12926(f)(2)(A-C).

25        As proof that she was able to perform the essential

26 functions under her Modified Work Offer, the only evidence

27 plaintiff presents is her unsupported statement that she had been

28 performing the job set forth in the "Notice of Offer of Modified

                                    22

or Alternative Work" for at least two months.  (Opp'n to Def.'s
Mot. for Summ. J. at 11:20-23 (Docket No. 21).)  The undisputed
evidence does not support this conclusion.

     The duties listed on plaintiff's Modified Work Offer
include: reviewing R/U files, performing animal welfare checks,
performing other Trainee duties in the barrier room, archiving
custom breeding folders, mail distribution, and cataloguing
tissue samples.  (Dominguez Decl. ¶ 4, Ex. A.)  Immediately upon
receiving the Modified Work Offer, plaintiff recognized that she
was unable to complete several of the listed duties.  (Pl.'s Dep.
at 254:6-255:22.)  Under the Modified Work Offer, plaintiff
initially spent anywhere from 40 to 50 percent of her time in the
barrier rooms.  (Id. at 251:19-252:6.)  By the time plaintiff's
physician declared her restrictions permanent, however, plaintiff
was no longer capable of conducting animal welfare checks or
performing any other duties within the barrier rooms because she
had difficulty dressing and undressing.  (Id. at 276:23-277:21,
Ex. GG.)

     Of the three remaining duties that plaintiff informed
defendant on January 21, 2011, that she was capable of doing
under her restrictions, she later complained that one, tissue
block organization, was also considered a repetitive activity
because she could not complete it without using her right hand.
(Id. at 243:15-245:8, 338:22-339:9, 340:17-19, Ex. OO.)  During
her March 3, 2011, meeting with defendant, plaintiff appears to
have only expressed interest in continuing her custom breed
archiving work for defendant and not the other duties listed in
the Modified Work Offer.  (Id. at 381:19-25, 396:3-23, Ex. DDD.)

1  Because plaintiff has presented no additional evidence regarding
2  the tasks that she was capable of completing at the time of her
3  termination, the only conclusion supported by the evidence is
4  that plaintiff was only capable of working on custom breed
5  archiving.[6]

6          Employees are not free to pick and choose which tasks
7  they wish to perform in a given employment position.  Of the
8  tasks that plaintiff was unable to perform at the time of her
9  termination, plaintiff's work in the barrier room originally took
10 up to 50 percent of plaintiff's time.  Plaintiff's ability to
11 perform only one task among the Modified Work Offer's list of
12 tasks is sufficient to find that there are no material facts
13 suggesting that plaintiff was able to perform the essential
14 functions under the Modified Work Offer.

15         During oral arguments on this motion, plaintiff's
16 attorney contended that the Modified Work Offer had actually been
17 orally modified each time plaintiff requested an additional
18 accommodation and that even after her disability became
19 permanent, she was still able to perform the orally modified
20 version of the Modified Work Offer.  In support of this
21 statement, counsel referred only to the statement contained in
22 plaintiff's declaration that the later modifications were
23 "mutually agreed upon."  (Pl.'s Decl. ¶ 16)  Even accepting
24 plaintiff's characterization of the Modified Work Offer as an

25

26         [6]    Even this conclusion is subject to dispute because
   plaintiff had emailed defendant to complain that she could do the
27 data entry portion of the custom breed archiving task, but that
   putting the files back, taking the pages out of the files, and
28 paper clipping/binding the stacks required repetitive use of her
   right arm.  (Pl.'s Dep. at 338:22-339:16, Ex. PP.)

offer of a permanent position, this does not establish that later modifications of the position created a permanent position with a new job description.  It only establishes that defendant accommodated plaintiff's disability.

Plaintiff is blurring the lines between <u>modification</u> and <u>accommodation</u>.  Plaintiff's argument implies that when an employer accommodates an employee's disability by changing their work duties, they are actually creating a brand new position for the employee with a modified set of essential duties.  If that were the case, every time an employer accommodated an injured employee by relieving her of the essential duties she could no longer perform, the employer would run the risk that the employee's injury would be revealed as permanent, and then according to plaintiff's reasoning, the employer would be required to permanently retain the employee with the lighter workload, while also having to engage a second person to carry out the essential duties of the original job the injured employee could no longer perform.  Without supporting authority, the court is unwilling to such a duty on employers.

Defendant was not obligated to transform plaintiff's temporary light-duty position into a permanent position, much less create a new position solely focused on custom breed archiving.  Even if defendant had such an obligation, plaintiff was unable to perform the essential duties of the light-duty position.  Plaintiff has therefore failed to meet her prima facie burden to show that there was a reasonable accommodation available that would render her a qualified individual.  Accordingly, the court will grant defendant's motion for summary

1  judgment as to plaintiff's claims for disability discrimination

2  and failure to reasonably accommodate.

3       B.   Failure to Engage in Interactive Process

4            It is also an unlawful employment practice "[f]or an

5  employer . . . to fail to engage in a timely, good faith,

6  interactive process with the employee . . . to determine

7  effective reasonable accommodations, if any, in response to a

8  request for reasonable accommodation by an employee . . . with a

9  known physical . . . disability . . . ."  Cal. Gov't Code

10 § 12940(n); see also Barnett v. U.S. Air, Inc., 228 F.3d 1105,

11 1114 (9th Cir. 2000), vacated on other grounds, U.S. Airways,

12 Inc. v. Barnett, 535 U.S. 391 (2002).  "Both sides must

13 communicate directly, exchange essential information and neither

14 side can delay or obstruct the process."  Id. at 1114-15.

15           "[A]n employer's duty to engage in an interactive

16 process to identify a reasonable accommodation . . . extends only

17 to accommodations that would enable the employee to perform the

18 essential functions of the position."  Nadaf-Rahrov, 166 Cal.

19 App. 4th at 975.  To prevail on a claim for failure to engage in

20 the interactive process, "an employee must identify a reasonable

21 accommodation that would have been available at the time the

22 interactive process should have occurred."  Scotch, 173 Cal. App.

23 4th at 995.

24           Plaintiff concedes that defendant adequately engaged in

25 the interactive process immediately following her injury, but

26 argues that by the time her employment was terminated the

27 interactive process had broken down.  (Opp'n to Def.'s Mot. for

28 Summ. J. at 12:13-16.)  As discussed above, no reasonable

26

1  accommodation was available at the time plaintiff's employment

2  was terminated because she was unable to complete the duties of

3  an Animal Care Trainee I with accommodation and a position under

4  the Modified Work Offer was not a reasonable accommodation even

5  if she had been able to complete the duties.  In this court's

6  opinion, defendant is to be commended for its extraordinary

7  efforts to accommodate plaintiff's disability from the time of

8  her injury to the time of her termination.  Accordingly, the

9  court will grant defendant's motion for summary judgment on

10 plaintiff's claim for failure to engage in the interactive

11 process.

12      C.   Wrongful Termination in Violation of Public Policy

13          To establish a tort claim for wrongful termination or

14 other adverse employment actions in violation of public policy, a

15 plaintiff must establish (1) an employer-employee relationship;

16 (2) termination or other adverse employment action; (3) the

17 termination or adverse action was a violation of public policy;

18 (4) the termination or adverse action was a legal cause of

19 plaintiff's damages; and (5) the nature and extent of the

20 damages.  Holmes v. Gen. Dynamics Corp., 17 Cal. App. 4th 1418,

21 1426 n.8 (4th Dist. 1993).  A plaintiff "must prove that his

22 dismissal violated a policy that is (1) fundamental, (2)

23 beneficial for the public, and (3) embodied in a statute or

24 constitutional provision."  Turner v. Anheuser-Busch, Inc., 7

25 Cal. 4th 1238, 1256 (1994) (footnotes omitted), overruled on

26 other grounds by Romano v. Rockwell Int'l, Inc., 14 Cal. 4th 479,

27 498 (1996).

28          Plaintiff's claim for wrongful termination in violation

1  of public policy is derivative of her statutory claims.  <u>See</u>
2  <u>Sanders v. Arneson Prods., Inc.</u>, 91 F.3d 1351, 1354 (9th Cir.
3  1996) (citing <u>Jennings v. Marralle</u>, 8 Cal. 4th 121, 135-36
4  (1994)) (no public policy claim against employers who have not
5  violated the law).  As summary judgment will be granted on
6  plaintiff's other claims, summary judgment is similarly granted
7  on the public policy claim.  See Cavanaugh v. Unisource
8  Worldwide, Inc., No. CIV-F-06-0119 AWI DLB, 2007 WL 915223, at
9  *11 (E.D. Cal. Mar. 26, 2007).  Accordingly, plaintiff's claim of
10  wrongful termination in violation of public policy fails as a
11  matter of law and the court will grant defendant's motion for
12  summary judgment on that claim.
13          IT IS THEREFORE ORDERED that defendant's motion for
14  summary judgment be, and the same hereby is, GRANTED.
15  DATED:  May 21, 2012
16
17  _____
18  WILLIAM B. SHUBB
    UNITED STATES DISTRICT JUDGE
19
20
21
22
23
24
25
26
27
28